IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **WILLIAM MCNEAL,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: |
| v. | ) |
| | ) |
| **PAYNE POULTRY, INC.** and | ) |
| **THOMAS PAYNE** | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW the Plaintiff, William McNeal, by and through his attorney, and brings this action against Payne Poultry, Inc. and Thomas Payne. Plaintiff contends that the Defendants violated 42 U.S.C. § 1981 and the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201, et seq. In support thereof, Plaintiff states the following:

### JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1981 and the Fair Labor Standards Act (hereinafter "FLSA"), as amended 29 U.S.C. §§ 201, *et seq*. This Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. § 1331.

2. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

3. At all relevant times herein, the Defendants' business activities were/are related and performed through unified operations or common control for a common business

purpose and constituted/constitute an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

4. At all relevant times herein, the Defendants employed and continue to employ persons in its place of business in furtherance of the activities of the above enterprise while engaged in interstate commerce, and, also at all relevant times herein, the Defendants engaged and continue to engage in commerce by handling, selling, and/or working on good or materials that have been moved in, or produced for, interstate commerce.

## PARTIES

5. Plaintiff William McNeal is a male citizen of the United States and a resident of Raleigh, Mississippi. Plaintiff was an employee within the contemplation of 29 U.S.C. § 203(e)(1).

6. Defendant Payne Poultry, Inc., (hereinafter "Payne Poultry") is an Alabama corporation registered to do business in Alabama whose principal office, per the Alabama Secretary of State's Office, is at 3728 Humber Road, Dora, Alabama 35062.

7. Defendant Thomas Payne, per the filings of the Defendants with the Alabama Secretary of State's office, resides at 876 Leslie Lane, Gardendale, Alabama 35071, which is in the Southern Division of the Northern District of Alabama.

8. Defendant Thomas Payne is the president of Payne Poultry. At all times relevant to the claims made the basis of this suit, Defendant Thomas Payne was acting in his capacity as manager and had operational control over the day-to-day functions of the Plaintiff, had direct responsibility for the compensation of the Plaintiff, and determined the day-to-day functions of the Plaintiff. Defendant Thomas Payne personally had the power to hire and fire the Plaintiff, personally supervised and controlled the Plaintiff's work schedules and conditions of his employment, personally determined the rate and method of payment to the Plaintiff as well as the Defendants' pay policies, and personally had involvement in and, to the extent that they were and are maintained, maintained the pay and employment records of the Plaintiff.

9. At all times material to this action, the Defendants have been an enterprise engaged in the commerce or in the production of goods for commerce as defined by § 203(s)(1) of the FLSA.

10. Payne Poultry is an interstate company whose employees are engaged in interstate commerce and whose employees handle and/or work on goods that have been moved in and/or produced in commerce.

11. At all times relative to this action, Payne Poultry has had, and continues to have, an annual gross volume of sales made or business done of not less than $500,000.00 (exclusive of excise taxes at the retail level which are separately stated).

12. At all times relevant to this action, each Defendant was an "employer" of the Plaintiff as defined by § 203(d) of the FLSA, and the Plaintiff was an "employee" of Defendant as defined by § 203(e)(1) of the FLSA. The Plaintiff worked for the Defendants within the territory of the United States within three years preceding the filing of this lawsuit.

13. The Defendants were the Plaintiff's employer and discriminated against him and retaliated against him in violation of 42 U.S.C. § 1981 (hereinafter "§ 1981"), and also did not pay him his rightful wages as required under the FLSA, as more specifically described below.

## STATEMENT OF FACTS

14. Plaintiff adopts by reference each and every material averment set out above as if fully set forth herein.

15. Defendants employ poultry workers to provide chicken catching services to poultry producers, with whom Payne Poultry contracts to provide such services. More specifically, Defendants employ many designated crews of employees, known in the industry as "live-haul catching crews" that, per a varied schedule, at times designated to them, gather, scoop and catch chickens at designated chicken houses at poultry farms and, by hand, place them in cages that are placed on forklifts. Defendants' forklift drivers then place the chickens into trucks, that then take the chickens to the Defendants' customers' nearby poultry plants to be slaughtered and processed.

16. Poultry processing is a very time sensitive and precise integrated process, from the incubation of eggs to the placing of chicks at farms to the harvesting and transport of chickens to the plants. This is ultimately because the chickens, while live creatures, have to fit into very precise and automated slaughtering and processing assembly lines. Thus, to tightly regulate the size and health of the chickens in order to do that, timing on every part of the process, including the live haul chicken catching services provided by Defendants, is crucial. Delays in the live haul catching, which would then create delivery delays and great problems in the integrated process at the plant, must be avoided at all costs. They would also greatly jeopardize the Defendants' business viability as there are a very limited number of poultry processors out there and thus a very limited number of customers. Defendants depend on much business from just a few customers, so the satisfaction of those few customers, which largely rests on the Defendants' crews staying on schedule and keeping up with their part of the crucial timing of the whole process, is paramount.

17. To ensure that the live haul catching, which is 100% dependent on the manpower of each crew being present at each day's scheduled farms (the crews go to a different set of farms each day) at the designated catching time, stays on schedule, Defendants transport the live-haul crews, via Defendant-owned vans, every day from their homes to that day's farms, and back to their homes at the end of the workdays. This

is because it is vital to Defendants' livelihood that the crew members be at the assigned farms, which vary every workday and are unknown to the crew members ahead of time, at certain times, which also vary daily and are also unknown to the crew members ahead of time.

18. Only the member of the crew permanently assigned to van driving and transport duty, is told by Defendants, only hours in advance, where each day's work assignments (which farms are being caught that day) are each day, so he knows where to transport the crew after he makes the rounds to pick them up from their houses. The rest of the crew just gets in the van at their respective houses, are delivered to whatever unknown (to them until they get on the van) farm they are catching at the beginning of that workday, and are taken back home at the end of each day.

19. There are roughly 40 - 50 different chicken farms that the Defendants' crews catch for the Defendants' customers. Some assignments require the crews to travel 30 minutes to get there after they have all been picked up by the van driver, while some may require three (3) hours of travel (one way) to get there. There is, of course, an equally long return trip at the end of the workday. The farms are not caught on any regular rotation and the day's farm locations are not provided to the van driver or the crews until the day that they go to them.

20. Often, the crews catch two or three assigned farms, at different locations, in one workday. Once the crew arrives at the assigned farms, either at the beginning of the workday, or during the workday, they are sometimes made to wait for the customer's trucks. The crews, including the Plaintiff, who are paid on a flat weekly rate or a piece rate basis on the number of chickens caught and placed in the cages, are not compensated at all for travel time or the time at the farms that they must wait for the convenience of the Defendants or their customers.

21. Plaintiff has been continually employed by Defendants for more than the three (3) years preceding the date of the Complaint. During the three years preceding this complaint, Plaintiff was generally paid a flat weekly rate, regardless of how many hours that he worked. From June of 2019 until May of 2021, Plaintiff was generally paid $500 a week, and from May of 2021 until Plaintiff was terminated in June of 2022, he was paid $550 a week. There were some weeks where Plaintiff was paid, like the live haul catchers on the crew, a piece rate based on the number of chickens that the crew caught. The number of hours worked by the Plaintiff was not properly recorded by Defendants, and had no actually direct bearing on the amount of compensation paid to the Plaintiff at any time. Plaintiff routinely worked in excess of 40 hours each workweek and never received any overtime pay.

22. Plaintiff's specific job in the live haul crew was to drive Defendants' van on the route to pick up the crew members from their houses and deliver them to the assigned farms for and throughout that day (as the crews often caught multiple farms in one day/shift) in Defendants' van, wait at the farms and, if the Defendant needed him to go and transport or deliver anything else, do that, and then drive the Defendant's van to deliver the workers back to their respective houses from the last farm caught. On some days and weeks, Plaintiff also caught chickens with the crews while at the farms, in addition to his van driving delivery duties.

23. Plaintiff's live haul crew, consistent with the industry, and Defendants' practices, generally had 9-10 people on it. Plaintiff's crew, other than himself and Daryl Spivey ("Spivey"), another African-American, was all Hispanic.

24. Plaintiff and Spivey were continually subject to racist slurs and discriminatory treatment. In May of this year, one of the Hispanic crew members loudly called Plaintiff the N-word. The Hispanic members of the crew all got more raises and better pay terms than African-American crew members. Plaintiff and Spivey complained about the racially discriminatory treatment to his supervisors, including Jesse Patrick and Thomas Payne's son-in-law, Todd (last name unknown to Plaintiff), who was a Payne Poultry manager ("Todd"). In response, Todd told Spivey "I'm all about keeping the Hispanic guys happy, not you black guys" and "Don't ask me for a raise in front of the Hispanic guys or I'll fire you." Jesse Patrick

told Plaintiff that if he complained any more about discriminatory treatment, he would get fired. Patrick also told Plaintiff to "keep your mouth closed" on the issue. Since Defendants relied on many Hispanics to fill their crew numbers in a time of labor shortage, they did not want to discipline them or cause problems for them, even with full knowledge of the racially discriminatory treatment of the Plaintiff and the other lone African-American member of the crew, McNeal.

25. The Hispanic crew members did not like or want African-Americans on the crew and tried to make life miserable for them. Recently, after Plaintiff and Spivey had already complained about the racially discriminatory treatment that he was receiving, the Hispanic loader driver intentionally struck Spivey's leg with the loader, injuring him. Defendants did not discipline the Hispanic loader driver, did not provide workers compensation to Spivey, and did not do anything to stop the continuing racially discriminatory treatment of the Plaintiff and Spivey. In fact, after Plaintiff again complained about it, after a short time, he was terminated, as was Spivey.

26. In light of all the foregoing, it is clear that Defendants, in addition to discriminating against Plaintiff in violation of 42 U.S.C. § 1981, also retaliated against him, motivated in an unlawful manner, also in violation of 42 U.S.C. § 1981.

## COUNT ONE – Violation of 42 U.S.C. § 1981

27. Plaintiff adopts by reference each and every material averment set out above as if fully set forth herein.

28. Defendants discriminated against Plaintiff because of his race in the terms of his terms, conditions and privileges of his employment. Plaintiff, an African-American and member of a protected class, was treated differently and worse that similarly situated non-African-American employees, in terms of less and lower pay, manner of payment, and different and worse disciplinary standards and treatment.

29. The unlawful actions of Defendants alleged herein were motivated by unlawful race discrimination. Defendants engaged in the race discrimination complained herein with malice and reckless indifference to Plaintiff's federally protected rights, thus entitling the Plaintiff to an award of non-pecuniary damages.

30. As a result of Defendants' conduct, Plaintiff has suffered extreme harm, including but not limited to, lost compensation and other benefits and conditions of his employment/contractual relationship with Defendants. Additionally, Plaintiff has suffered injury including pain, humiliation, and mental anguish and suffering, stress, worry, sadness, fear, anxiety, sleepless night, out of pocket expenses and loss of enjoyment of life.

## COUNT TWO – Retaliation - 42 U.S.C. § 2000 (e)

31. Plaintiff adopts by reference each and every material averment set out above as if fully set forth herein.

32. Defendants retaliated against Plaintiff for reporting and objecting to acts of racial discrimination. When the Plaintiff complained of disparate treatment related to raises and otherwise, lower pay, racial slurs, and being called the N-word, the Defendants retaliated against Plaintiff by terminating him.

33. As a result of Defendants' conduct, Plaintiff has suffered extreme harm, including but not limited to, lost compensation and other benefits and conditions of his employment/contractual relationship with Defendants. Additionally, Plaintiff has suffered injury including pain, humiliation, and mental anguish and suffering, stress, worry, sadness, fear, anxiety, sleepless night, out of pocket expenses and loss of enjoyment of life.

## COUNT THREE – FLSA Violations

34. Plaintiff adopts by reference each and every material averment set out above as if fully set forth herein.

35. At all times relevant herein, Defendant was responsible for paying wages to Plaintiff, and Plaintiff was employed with Defendant as an "employee" within the meaning of the FLSA.

36. Under the FLSA, an employer must pay an employee for all hours worked and at least one and one-half times his or her regular rate of pay for each hour worked in excess of forty hours per workweek. As a non-exempt employee, Plaintiff was entitled to such straight-time and overtime compensation, but, as described earlier in this Complaint, the Defendants failed and refused to comply with the FLSA's wage requirements by failing to pay the Plaintiff at one-and-one-half of his regular hourly rate for any of the hours that he worked in excess of forty hours per week during the Plaintiff's employment as described in this Complaint.

37. Defendants have failed to comply with the FLSA by failing to keep and maintain accurate records and information documenting the hours worked and wages earned by the Plaintiff.

38. Defendants willfully failed to properly pay Plaintiff in accordance with the FLSA for at least three years preceding the filing of this complaint. This willfulness is shown by the Defendants doing so even after previous overtime lawsuits involving their live haul catching crews, and by being directed, in writing, by one of their customers, prior to and again in January of 2020, of their obligations under the FLSA regarding their live haul catching crews such as the Plaintiff's crew.

39. Defendants have also willfully refused to pay Plaintiff's last paycheck for his last week of work.  The Defendant's failure to pay the Plaintiff that compensation by at

the regular payday for the period in which the workweek ends is impermissible under the FLSA. 29 C.F.R. § 790.21(b) (emphasis added).

40. Defendant's willful violations have caused financial damage to the Plaintiff consisting of loss of pay.

41. At all material times herein, the Plaintiff has been entitled to the rights, protections, and benefits provided under the FLSA.

42. None of the FLSA exemptions apply to the Plaintiff, who was a non-exempt employee. Accordingly, the Plaintiff must be paid in accordance with the FLSA.

43. The Defendants' failure to accurately pay overtime was, and is, willfully perpetrated. The Defendants have not acted in good faith nor with reasonable grounds to believe their actions and omissions were not a violation of the FLSA, and, as a result thereof, the Plaintiff is entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime premium pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

44. The Plaintiff is entitled to an award of prejudgment interest at the applicable legal rate as well as reimbursement of his costs, attorneys' fees, and expenses incurred.

45. As a result of these willful violations of the FLSA's overtime provisions, overtime compensation has been unlawfully withheld by the Defendants from the Plaintiff for which the Defendants are liable pursuant to 29 U.S.C. § 216(b).

## PRAYER FOR RELIEF

**WHEREFORE, PREMESIS CONSIDERED,** the Plaintiff respectfully requests that this Court grant the following relief:

(a) That this Court award the Plaintiff the amount of his unpaid wages including overtime wages, plus an additional equal amount as liquidated damages;

(b) Grant the Plaintiff the appropriate amount of back pay, front pay, loss of employment benefits, and other damages for the unlawful and discriminatory practices of the Defendants;

(c) Grant the Plaintiff an award of compensatory to make him whole, and punitive damages as appropriate and allowed by law;

(d) Award the Plaintiff his costs and expenses, including a reasonable attorney's fee; and,

(e) Award such other and further relief as may be permitted by statute or as may be just and proper.

Dated this 1st day of August, 2022.

Respectfully Submitted,

**/s/ David A. Hughes**
David A. Hughes (ASB-3923-U82D)
Attorney for Plaintiff
2121 14th Street
Tuscaloosa, Alabama 35401

Telephone: (205) 523-0463
E-mail: dhughes@hardinhughes.com

## JURY DEMAND

Plaintiff demands a trial by struck jury herein.

/s/ David A. Hughes
OF COUNSEL

**Please serve Defendant Payne Poultry, Inc. at:**

Stacy Payne
Registered Agent for Payne Poultry, Inc.
3728 Humber Road
Dora, AL 35062

**Please serve Defendant Thomas Payne at:**

Thomas Payne
876 Leslie Lane
Gardendale, AL 35071